J-S20026-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.V.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.N., MOTHER | : | |
| | : | |
| | : | No. 3137 EDA 2025 |

Appeal from the Order Entered November 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000832-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.V.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.N., MOTHER | : | |
| | : | |
| | : | No. 3138 EDA 2025 |

Appeal from the Decree Entered November 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000018-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: D.V.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.N., MOTHER | : | |
| | : | |
| | : | No. 3139 EDA 2025 |

Appeal from the Order Entered November 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000833-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: D.E.V.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S20026-26

|                                   |   |                        |
|-----------------------------------|---|------------------------|
| APPEAL OF: W.N., MOTHER           | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : | No. 3140 EDA 2025      |

Appeal from the Decree Entered November 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000020-2025

|                                   |   |                        |
|-----------------------------------|---|------------------------|
| IN THE INTEREST OF: E.V.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|                                   | : |                        |
|                                   | : |                        |
| APPEAL OF: W.N., MOTHER           | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : | No. 3141 EDA 2025      |

Appeal from the Order Entered November 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000834-2021

|                                   |   |                        |
|-----------------------------------|---|------------------------|
| IN THE INTEREST OF: E.I.V.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|                                   | : |                        |
|                                   | : |                        |
| APPEAL OF: W.N., MOTHER           | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : |                        |
|                                   | : | No. 3142 EDA 2025      |

Appeal from the Decree Entered November 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000019-2025

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JULY 29, 2026**

- 2 -

W.N. ("Mother")[1] appeals from the decrees terminating her parental rights as to her children, A.V.N., D.V.N., and E.V.N. (collectively, "Children"),[2] and from the orders changing the permanency goal from reunification to adoption. She challenges the sufficiency of the evidence. We affirm the termination decrees and dismiss the goal-change appeals as moot.

The trial court accurately described the background of the case as follows:

> On April 22, 2018, [t]he Department of Human Services ("DHS") received a General Protective Services ("GPS") report alleging that [Mother] was behaving erratically at the emergency department of Children's Hospital of Philadelphia ("CHOP"). The report further alleged that D.V.N.[, who was three months old,] was being treated for bowel surgery and that staff wanted to place a social hold on A.V.N.[, who was 20 months old.] DHS learned that Mother had a cognitive delay and was incorrectly mixing formula for D.V.N. who was underweight.
>
> On June 14, 2018, DHS implemented in home services for the family through Community Umbrella Agency ("CUA").
>
> [In November] 2019, E.V.N. was born.
>
> All three children are medically needy. They receive primary care through the special needs clinic at St. Christopher's Hospital for Children and Special Medical Care through St. Christopher's Hospital for Children.

---

[1] Father's appeal is at No. 3143 EDA 2025. We address it in a separate decision.

[2] The adoption dockets list Children's names with middle names that are omitted from the dependency dockets, resulting in Children being identified by different initials in the captions in the appeals from the different dockets. For clarity and simplicity, we will use the initials from the dependency dockets.

D.V.N. has been diagnosed with internal tibial torsion (an inward twisting of the tibia), constipation, and developmental delays, including communication disorder and temper tantrums. He receives specialized care for E.N.T., gastroenterology, ophthalmology, and orthopedics.

[A].V.N. has been diagnosed with seizure disorder and developmental delays, including communication disorder, Hirschsprung's disease (a congenital malfunction of the intestines that causes difficulty passing stool), constipation, bacterial enterocolitis, congenital central hypoventilation syndrome, genu valgum (knock knees) and obstructive sleep apnea. She receives specialty care in audiology/speech therapy, cardiology, ENT care, genetics, gastroenterology, neurology and orthopedic surgery.

E.V.N. has been diagnosed with Hirschsprung's disease, constipation, congenital central hypoventilation syndrome, patent foramen ovale (a small hole in the heart), femoral anteversion (inward rotation of the femur bone in the upper leg), developmental delays, speech delays and obstructive sleep apnea. She receives specialized care in E.N.T., genetics, gastroenterology, pulmonary and orthopedic surgery.

Since CUA-[Northeast Treatment Centers ("NET")] intervened in [their] services, they had continued issues with ensuring [Mother] made the necessary medical appointments and obtained necessary prescriptions for the [C]hildren . . .

On October 26, 2021 CUA-NET went to Mother's home and observed that it smelled of feces. E.V.N. was crying hysterically and appeared to be in pain. Mother initially refused to bring her to a hospital. E.V.N. was eventually admitted to the hospital. Father was reportedly no longer willing to care for [C]hildren.

On October 27, 2021[, DHS] obtained an order of protective custody (OPC) for A.V.N. and D.V.N.

On November 2, 2021, A.V.N. and D.V.N. were placed in a foster home.

On November 2, 2021 an adjudicatory hearing for E.V.N. was held [and the court] ordered an OPC to be obtained [for

- 4 -

E.V.N.] upon her discharge from St. Christopher's Hospital for Children.

On November 9, 2021, E.V.N. was discharged from St. Christopher's Hospital for Children and placed in a foster home.

On November 17, 2021[,] A.V.N., D.V.N. and E.V.N. were adjudicated [d]ependent and further committed to [DHS.]

Trial Court Opinion, filed 3/2/26, at 3-5.

On January 10, 2025, DHS filed petitions to involuntary terminate Mother's and Father's parental rights. A hearing on the petition was held on April 23, 2025 and October 28, 2025. Mother and Father were present and represented by counsel. A Spanish interpreter was also present.

At the termination hearing, DHS presented the testimony of CUA case manager, Jha-keara Porter. Porter testified the case originated due to medical neglect. N.T., 4/23/25, at 135. She explained that Mother and Father were not following through on medical appointments and ensuring Children received medications. *Id.* Porter stated that CUA provided in-home safety services to the family for two to three years before Children were committed to DHS. *Id.* at 135-36. Porter stated that the family has eight children, but when she was assigned to the case in 2022, only A.V.N., D.V.N., and E.V.N. lived in the home. The other five children had been previously adopted. *Id.* at 136.

Porter testified that Mother has an intellectual disability and receives Social Security payments. N.T., 10/28/25, at 22. She stated that Mother's single plan objectives were as follows: attend all medical appointments for Children; attend supervised visits twice per week at the agency for two hours;

sign all release and consent forms for treatment; complete parenting classes; complete a parenting capacity evaluation; and complete a bonding evaluation. N.T., 4/23/25, at 142-43. Porter stated that Mother completed all of her objectives and was fully compliant. *Id.* at 147. Nonetheless, Porter recommended that Mother's parental rights be terminated because "when we go back to why the case came in, the medical needs of the [C]hildren and understanding what the [C]hildren need [] specifically, [M]other has not been able to present to us that she understands and knows exactly how to care for her [C]hildren." *Id.* at 148.

Porter testified that A.V.N. has been diagnosed with oppositional defiant disorder ("ODD") and attention-deficit/hyperactivity disorder, as well as constipation and allergies. *Id.* at 150. She stated that Mother told her that she does not understand why A.V.N. needs medication for his ODD. *Id.* at 152. Porter had concerns as to Mother's understanding of A.V.N.'s conditions, "[s]pecifically with his behavioral diagnoses, [M]other knows that [A.V.N.] has moments when he is aggressive and when he is defiant, but [Mother] believes that it's just him being a boy." *Id.* at 152-53.

Porter did not believe that A.V.N. could be safely reunified with Mother because she cannot manage his behaviors and "a lot of . . . interactions with his parents are the very thing[s] that trigger him to have these behaviors." *Id.* at 155-56, 159. Porter stated that A.V.N. is placed in a treatment-level foster home and his behaviors have improved since being placed. *Id.* at 160-61. She said that A.V.N.'s foster parents meet all of his needs and are doing

a "phenomenal job" at deescalating his behaviors. *Id.* at 161. Porter believed that A.V.N. would not suffer any irreparable harm if Mother's rights were terminated and it was in his best interests to be freed for adoption. *Id.* at 165-66. She stated that while Mother and A.V.N. have a bond, it is an "exchange bond," where Mother brings treats or digital devices to A.V.N, and it is not a healthy, parent-child bond. *Id.* at 165-66, 213. Porter further noted that A.V.N. is parentified. *Id.* at 215.

Porter testified that D.V.N. has been diagnosed with Hirschsprung's disease, severe constipation, allergies, and developmental delays. *Id.* at 167, 204. She stated that D.V.N. needs daily anal irrigations due to her diagnoses and goes to the doctor at least three times per month. *Id.* at 169-70. Porter said that Mother has been trained by the doctor on how to perform the irrigations, but Porter had "not been in a home setting with either parent since [Children] have been removed for [her] to observe them completing an[] irrigation." *Id.* at 170-71. Porter further testified that D.V.N. has "bowel explosions" during the night between 3:00 a.m. and 4:00 a.m. *Id.* at 176. Mother's response to Porter's concerns about this "was [to] place down a poopy pad" and "[M]other actually provided us with those." *Id.* at 176-77.

Porter believed that Mother did not understand the significant nature of D.V.N.'s needs. *Id.* at 171-72. She stated that Mother was never fully able to tell her if D.V.N. needed medical attention when her stomach was "big." *Id.* at 172. Porter recalled one incident where D.V.N. was very lethargic and kept falling asleep during a visit. *Id.* Both Mother and Father failed to recognize

that D.V.N. needed immediate medical attention, but the case aide brought it to Porter's attention and they "stopped the visit and rushed [D.V.N.] to the hospital." *Id.* at 172-73. Porter also said that Mother told her that Hirschsprung's disease "can go away," but Porter testified that Hirschsprung's disease is a lifetime diagnosis. *Id.* at 174.

Porter believed that D.V.N. would not suffer any irreparable harm if Mother's rights were terminated and it was in her best interests to be freed for adoption. *Id.* at 175, 177. She pointed out that D.V.N. called Mother by her first name and had "a long list of her dream home, but none of them included her parents." *Id.* at 175. Porter testified that D.V.N. does not look to Mother as a maternal figure. *Id.* at 215. Due to D.V.N.'s medical issues, Porter explained that it had been difficult to find a foster family for D.V.N. "willing to [care for her] for a long period of time" and DHS had struggled to find placement for her. *Id.* at 176. Porter testified that D.V.N was removed from her most recent foster home in February 2025 due to the resource parent not being able to meet her needs. *Id.* at 169-70. At the time of the termination hearing on April 23, 2025, D.V.N. was in the hospital on a "social hold" due to the "anal irrigations and no one being able to perform them[.]" *Id.* at 169. Porter testified that if D.V.N. was freed for adoption, "that opens a new set of homes to identify, post-TPR, for adoption purposes" and "if she was open for adoption, we could find her [a] safe forever home." *Id.* at 177. On the other hand, Porter believed that "if we continue with not being open for adoption,

she will remain in[] the hospital until we're able to find someone that will be able to bring her in and help assist her." *Id.*

Porter testified that E.V.N. has also been diagnosed with Hirschsprung's disease, and that she wears a colostomy bag. *Id.* at 178. She also is pre-diabetic and has allergies and developmental delays. *Id.* at 178, 203-04. Porter had concerns about Mother providing permanency and safety to E.V.N. because she did not "believe that [M]other fully understands the medical needs of [E.V.N.]." *Id.* at 178-79. Porter acknowledged that Mother was trained to handle the colostomy bag, but she pointed out that Mother decided to get E.V.N. a colostomy bag, instead of the less severe option of continued irrigations. *Id.* at 179. Porter stated that E.V.N. was placed in a medical treatment foster home where the foster parent is meeting all of her daily and medical needs. *Id.* at 180. Porter testified that E.V.N. does not look to Mother as a maternal figure. *Id.* at 215. She pointed out that E.V.N. refers to Mother and Father by their first names and calls her resource parents "mom" and "dad." *Id.* at 181. Porter believed that E.V.N. would not suffer any irreparable harm if Mother's rights were terminated and it was in her best interests to be freed for adoption. *Id.* Porter pointed out that E.V.N. was the most resilient and adaptable out of Children despite having been placed in multiple homes. *Id.* at 215-16.

Regarding Father, Father has an intellectual disability and receives Social Security payments. N.T., 10/28/25, at 101. Porter testified that Father largely had the same single plan objectives as Mother and was fully compliant.

N.T., 4/23/25, at 183. Nevertheless, Porter had concerns about Father's capacity to parent Children. *Id.* at 183-84. As to A.V.N., Porter noted that A.V.N. physically attacks Father during visits, and Father is unable to deescalate and redirect him. *Id.* at 184. Porter testified that there had been times when D.V.N. and E.V.N. would get hurt at visits because of A.V.N.'s aggression toward Father or would join in by throwing shoes and toys at Father. *Id.* at 191-92. Porter testified that A.V.N. has never been aggressive to any other adults in his life except to Father and "sometimes [M]other." *Id.* at 197-98. Porter believed that A.V.N. would not suffer any irreparable harm if Father's rights were terminated and it was in his best interests to be freed for adoption. *Id.* at 185. She further did not think A.V.N. was bonded to Father. *Id.*

As to D.V.N., Porter had concerns about Father understanding her medical needs, being able to perform those needs, and ensuring her medical appointments. *Id.* Porter pointed out that when Father attends D.V.N.'s medical appointments, he does not ask the medical professionals about her care but rather calls Porter afterwards and asks about D.V.N.'s medical needs. *Id.* at 186. Porter testified that she would have concerns if the CUA was removed from servicing the family and Children were reunified with Father. *Id.* at 186. She explained, "[F]ather really depends on us, even when it comes to updating him about appointments, when it comes to him having questions about [D.V.N.'s] medical needs, when it comes down to just trying to explain to me." *Id.* at 187. Porter testified that Father has been trained on how to do

irrigations, but he has never done one. *Id.* at 202. Porter also noted that Father lives with his mother and father and is their caregiver. *Id.* at 188. Porter stated that Father told her if the girls were to live with him, his mother will bathe them and change their diapers because Father did not feel comfortable doing that as "he felt he was disrespecting his daughters' bodies if he was to be around them when they were in the nude." *Id.* at 198-99.

As to E.V.N., Porter testified that she did not believe that E.V.N. was bonded or connected with Father. *Id.* at 189. She stated that E.V.N. puts on a "baby-like tone" when she is with Father and tries to convince him to do things in her favor, and Father "always give[s] into these behaviors, which triggers her to be more impulsive and explosive[.]" *Id.* Porter stated that this "regressive behavior" occurs during visits with Father and Mother. *Id.* at 217. Porter believed that E.V.N. would not suffer any irreparable harm if Father's rights were terminated and it was in her best interests to be freed for adoption. *Id.* at 188-89.

Porter testified that, overall, despite Mother and Father completing parenting classes and having a parent mentor, neither their ability to control Children nor their understanding of Children's medical conditions had improved. *Id.* at 192-96. Porter said that although Mother and Father attend Children's medical appointments, they do not understand why Children need medical interventions. *Id.* at 195-96. Porter further testified that despite the parents having completed a nutrition class and being informed about the food that Children cannot have, Mother, in particular, continued to give Children an

- 11 -

excessive amount of candy and treats and did not understand "the excessiveness issue[.]" *Id.* at 206-210. Porter testified that Father was initially "doing a good job" in bringing food to the visits, but "then he stopped bringing meals." N.T., 10/28/25, at 84. Porter said that Children do not have any issues separating from Mother and Father after visits. N.T., 4/23/25, at 218. Porter testified that Mother and Father love Children, and Children love them. N.T., 10/28/25, at 63. However, she said that the "sole purpose" Children would want reunification is because the parents promised Children would get "a puppy, toys, [and] treats" if they were reunified. *Id.* at 62.

Dr. William Russell, Director of Clinical Services at Assessment and Treatment Alternatives and at Forensic Mental Health Services, testified that he conducted parent capacity evaluations on Mother and Father in 2022 and a bonding evaluation with the parents and Children in 2024. *Id.* at 90. As to Mother's parenting capacity, Dr. Russell found that Mother had "some significant cognitive limitations." *Id.* at 93. He explained that Mother "functioned on a very concrete level [and] she could do well when you gave her clearcut do this, do that, and then do this." *Id.* He stated that she "had difficulty reacting to situations where she was provided information in an abstract or complex manner." *Id.* at 93-94. Dr. Russell had concerns about her ability to provide permanency and stability, given Children's medical issues. *Id.* at 94. He explained that Mother's "description of the problems was rather simplistic, given the fact that there was a language behavior, a cognitive disability, understanding complex medical instructions, complex

medical data, complex care issues, she would have a difficult time with those and would need assistance." *Id.* at 94-95. Dr. Russell concluded, at the time of his evaluation in 2022, that Mother "was not able to provide a safe environment for her children without substantial support." *Id.* at 98.

Dr. Russell testified that when he conducted Father's parenting capacity evaluation in 2022, Father informed him that he was not interested in taking full-time care of Children but would assist Mother in caring for Children. *Id.* at 101. As a result, Dr. Russell did not directly analyze Father's ability to provide permanency and safety for Children. *Id.* at 101-02. Dr. Russell acknowledged that, at the time of the termination hearing, Father wanted to be reunified with Children. *Id.* at 102.

As part of his bonding evaluation in 2024, Dr. Russell observed a visit between Mother, Father and Children. *Id.* at 108. Dr. Russell testified that there did not "seem to be any imminent risk of harm to the [C]hildren," but noted that the evaluation is conducted in an "incredibly controlled setting." *Id.* at 109, 118. He stated that Children "clearly have a relationship with their parents." *Id.* at 110. He explained that "[t]he physical reactions of the [C]hildren in greeting their parents, the comfort level in ongoing behavior and activities throughout the visit clearly showed that the [C]hildren related to [M]other, related to [F]ather in a very positive manner, and that there clearly was a history and a relationship between them." *Id.* When asked whether Children have a bond with Mother and Father, Dr. Russell replied, "The [C]hildren clearly recognize who their mother and father biologically are, and

they have a relationship to them, one that they easily express and comfortably express when brought together." *Id.* at 112. Dr. Russell opined that there would be no irreparable harm to the girls, D.V.N. and E.V.N., if Mother's and Father's rights were involuntary terminated. As to A.V.N., Dr. Russell testified that "given [his] existing behavioral [] problems, he would require an intervention of some type therapeutically to assist with any breakoff of the relationship" with Father, but with the appropriate support, "he would be able to handle it, as long as supports were in place." *Id.* at 113-14, 174.

After conducting a bonding evaluation in 2024 and listening to the testimony at the termination hearing, Dr. Russell "still ha[d] concerns about the parents' ability to manage medical issues with the [C]hildren." *Id.* at 99. He stated that both parents continued to have difficulty understanding the medical information and continued to demonstrate "significant holes in their knowledge of what's going on," which was problematic from a safety standpoint. *Id.* at 99-100, 129-30. He recognized that both parents were fully compliant with their objectives but testified that "compliance simply means you followed a direction" and "compliance entails simple superficial physical compliance such as we often talk about a person being told to go to therapy as part of their case plan." *Id.* at 118-19. Dr. Russell noted that "[n]either parent was able to describe that their [C]hildren were in special education or their specific problems, other than to say that [A.V.N.] was acting out behaviorally in school." *Id.* at 100. Dr. Russell opined that both Mother and Father lack the capacity to parent independently. *Id.* at 137, 139. He pointed

out that Mother and Father "will need ongoing assistance, given that they have medically needy children," and as Children age, "those problems are only going to become more serious and have a greater impact on the [C]hildren and require intervention." *Id.* at 138.

A case aide from NET, Leslie Rosario, testified that she supervised visits between the parents and Children for over two years. *Id.* at 185-86. Rosario testified that she continued to have concerns about the parents' ability to maintain a safe environment for Children. *Id.* at 180. She observed numerous incidents of A.V.N. attacking Father and Mother and dragging his sisters to the point they had brush burns, and Mother treating E.V.N. "like a baby inappropriately." *Id.* at 181-82. She noted that the visits never progressed to unsupervised and she had to intervene over 75 percent of the time during visits to keep Children safe because "the parents lack that ability." *Id.* at 182. Rosario stated that the parents lack boundaries with Children and she has to repeatedly redirect parents and explain to them why she was recommending that redirection. *Id.* at 181-83. When asked whether the parents understood what she was saying, Rosario replied, "Not really, no." *Id.* at 181. Rosario testified, based on her observations, that Mother and Father cannot keep Children safe. *Id.* at 183.

The Child Advocate informed the court that A.V.N. "would like to stay where he's at and be adopted." *Id.* at 204. She indicated that the last time she visited A.V.N., he "wasn't really interested in visiting with his parents." *Id.* Regarding the girls, the Child Advocate indicated:

[D.V.N.], she wants to go home, but she also wants to stay where she's at, and she misses her sister since they're separated. And she's happiest, if she can't go home, staying where she's at.

[E.V.N.], she wants to stay where she's at. She wants to go with her parents, and she wants to live with her sister. She wants all three of those things. So she has repeated all the time that she wants to go with her parents, but she also has always said she's happy staying where she's at. She's five.

*Id.*

Father testified that he did not want his parental rights to be terminated and wanted Children to live with him. N.T., 4/23/25, at 25-26. He stated that he presently resides with his mother and father, and there are rooms there for Children. *Id.* at 34-35. Father stated that he goes to all of Children's medical appointments, but often times, he forgets what the doctors said afterwards. *Id.* at 35, 56-57. Father testified that he has been trained on how to handle a colostomy bag and he changed it "one time in an appointment in a hospital." *Id.* at 45-46. He said that he has not been trained on how to perform irrigations, but he would be willing to do them after proper training. *Id.* at 45, 65. Father believed that he fully understands all of Children's medical diagnoses and needs. *Id.* at 95. Father testified that he does not have a job but receives income from SSI due to his learning disability. *Id.* at 96-97. When asked if he could care for Children by himself, Father replied, "Yes, because I have support," and, "[M]y family, they'll help me." *Id.* at 86, 88.

Mother testified that she did not want her parental rights to be terminated and wanted to be reunified with Children. *Id.* at 99. Mother

- 16 -

believed she was capable of handling all of Children's medical needs. *Id.* at 127. She explained that she lives by herself and each child would have their own bed. *Id.* at 126. Mother stated that her mother, sister, next-door neighbor, friend, and Father can help her take care of Children. *Id.*

As to A.V.N., Mother testified that he takes MiraLAX for constipation and a pill for his "hyper anxiety." *Id.* at 103. Mother did not know what the name of the pill was, but she was opposed to him taking the pill. *Id.* Mother further testified that A.V.N. "had a study in his head" where "they put something in his head." *Id.* Mother stated that the nurses "did not want to give [her] information" about why the procedure was done, but it was an overnight procedure and she "think[s] it was for sleeping." *Id.* at 103-04. As to D.V.N, Mother testified that she has Hirschsprung's disease and "was operated on since she was a baby up until age three[.]" *Id.* at 105. When asked what those operations were for, Mother replied, "Because of the Hirschsprung's condition. That's what the doctors told me. In other words, she cannot get dirty. That's my understanding." *Id.* at 106. Mother could not explain the difference between Hirschsprung's disease and constipation. *Id.* at 117. Mother stated that she had previously done irrigations on D.V.N. *Id.* at 107-08. As to E.V.N., Mother testified that "she has some different condition that her sister in some ways" and she "takes MiraLAX, and she carries some sort of bag with her and she has high sugar, diabetes." *Id.* at 108. Mother stated she had changed her bag in the past. *Id.* Mother said that she has "to

check [E.V.N.'s] sugar by punching her and getting blood," but she has not had to do that yet. *Id.* at 117.

Mother stated that visits with Children go well, and when Children see her, they say "Mommy," hug her, and look happy. *Id.* at 112. Mother acknowledged that Rosario intervened at visits when A.V.N. attacked her or Father, and when D.V.N. and E.V.N threw their shoes at Father. *Id.* at 114-15. Mother stated that she brings food for Children at visits and Children have no dietary restrictions. *Id.* at 112-13, 119.

After the termination hearing, the court involuntarily terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), and § 2511(b). The court also entered orders changing Children's goals to adoption. This appeal followed.

Mother raises the following issues:

1.) Whether the trial court abused its discretion and/or erred as a matter of law in terminating [M]other's parental rights under 23 Pa.C.S.[A.] 2511(a) and (b) because its decision was not supported with competent evidence.

2.) Whether the trial court abused its discretion and/or erred as a matter of law in changing the permanency goal to adoption from reunification as there was not competent evidence that it was in the best interests of the [C]hild[ren].

Mother's Br. at 8.

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). We "accept the findings of fact and credibility determinations of the trial court if

they are supported by the record." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (quoting ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." ***In re Adoption of K.C.***, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***In re Adoption of S.P.***, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. ***In re Adoption of K.C.***, 199 A.3d at 473. "Clear and convincing evidence is evidence 'that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" ***Id.*** (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, the court terminated Mother's and Father's parental rights pursuant to Section 2511(a)(1), (2), (5), and (8). As only one basis for termination under Section 2511(a) is necessary, we will focus our attention on the court's termination of Mother's and Father's parental rights pursuant to Section 2511(a)(2). That section states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> ***

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2),

> the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa.Super. 2019) (cleaned up).

This Court has explained:

> [S]ection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in [S]ection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it[.]

*In re E.A.P.*, 944 A.2d 79, 82 (Pa.Super. 2008) (cleaned up)

The grounds for termination under Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). "A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity." *In re Adoption of S.P.*, 47 A.3d at 827 (citation omitted). However, in enacting the Adoption Act, our legislature "concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *Id.* (citation omitted). This Court has acknowledged "the unfortunate and disheartening effect such action may have on parents; however, that does not make it any less appropriate, for it is the needs and welfare of the child that

are of paramount concern to this Court." *In re B.L.W.*, 843 A.2d at 387 (citation and internal quotation marks omitted).

Here, the court found that "[t]he evidence presented made it clear [that] both [Mother's and Father's] intellectual disabilities preclude them from being able to provide safety and appropriate care to three young children with significant and complex physical, emotional and intellectual abilities." Trial Ct. Op. at 29.

Based upon our review of the record, we discern no abuse of discretion in the court's decision to terminate Mother's and Father's parental rights under Section 2511(a)(2). It is undisputed that both Mother and Father desire to raise Children and were fully compliant with their single plan objectives. However, the evidence was that Mother's and Father's continued incapacity cannot be remedied given the heightened needs of Children. The case initially came to DHS's attention in 2018 due to medical neglect. Despite DHS providing in-home services to the family for two to three years, Children were committed to DHS in 2021 for the same reasons. There was ample testimony that Mother and Father continued to lack the ability to manage Children's medical needs and care for Children. The evidence showed that neither Mother nor Father made any improvement in understanding Children's diagnoses or medical issues over the life of the case. Dr. Russell opined that both Mother and Father lack the capacity to parent Children independently. There was also ongoing safety concerns at the visits, wherein the case aide had to intervene 75 percent of the time because Mother and Father were incapable of keeping

Children safe. The record thus supports the court's decision that Mother and Father are incapacitated and cannot properly care for Children. The court correctly recognized that Children's needs and welfare are the paramount concern. *In re B.L.W.*, 843 A.2d at 387. Accordingly, we conclude that the court did not err by involuntarily terminating Mother's and Father's parental rights under Section 2511(a)(2).

We next determine whether the court's finding that termination was warranted pursuant to Section 2511(b). Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). However, the "mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011).

In addition to examining the parental bond, the court's Section 2511(b) analysis must consider other important factors. These include "the child's need for permanency and length of time in foster care"; "whether the child is in a pre[-]adoptive home and bonded with foster parents"; and "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Int. of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023).

- 23 -

Here, the court found:

> Although there is evidence of a parental bond with Children and Parents, the parental bond is insufficient to overcome a crucial need for [C]hildren to live with caregivers who are able to understand and fulfill their various needs.
>
> Moreover, testimony from an expert forensic psychologist indicated that any psychological harm to the Children could be neutralized with proper support.

Trial Ct. Op. at 29.

This was not an abuse of discretion. Although there was evidence that Father and Mother clearly loved Children and had a relationship with them, we agree that DHS proved by clear and convincing evidence that termination of Mother's and Father's parental rights was in Children's best interest. Children had been removed from their parents' care for almost four years, and visits never progressed from supervised to unsupervised.

As to A.V.N, Porter testified that A.V.N.'s resource parent is doing a "phenomenal job" at deescalating A.V.N.'s behaviors and his behavior has improved since being placed. The Child Advocate stated that A.V.N. wants to stay in his foster home and was not interested in having visits with Mother and Father. Porter believed that A.V.N. and Mother did not have a healthy parent-child bond, but rather an "exchange bond," and that A.V.N. and Father were not bonded. She believed that A.V.N. would not suffer any irreparable harm if Mother's and Father's rights were terminated and it was in his best interests to be freed for adoption.

As to D.V.N., Porter testified that D.V.N. called Mother by her first name and did not look to her as a maternal figure. Porter stated that D.V.N. had a long list of her wishes for a "dream home," but the list did not include Mother or Father. At the October 28, 2025 termination hearing, the Child Advocate stated that D.V.N. wanted to go home, but she also wanted to stay in her foster home.[3] Porter believed that D.V.N. would not suffer any irreparable harm if parental rights were terminated and it was in her best interests to be freed for adoption. Dr. Russell agreed that there would be no irreparable harm to D.V.N. if Mother and Father's rights were involuntary terminated.

As to E.V.N., Porter testified that E.V.N. does not look to Mother as a maternal figure and is not bonded to Father. She pointed out that E.V.N. refers to Mother and Father by their first names and calls her resource parents, who are meeting all of E.V.N.'s daily needs, "mom" and "dad." Porter believed that E.V.N. would not suffer any irreparable harm if Mother's and Father's rights were terminated and it was in her best interests to be freed for adoption. Dr. Russell agreed that there would be no irreparable harm to E.V.N. if Mother and Father's rights were involuntary terminated.

The record thus supports the trial court's factual findings, and it did not abuse its discretion in finding termination would best support Children's physical, mental, and emotional needs under Section 2511(b).

_____

[3] At the time of the October 28, 2025 hearing, D.V.N. was in a medical foster home through First Choice. **See** N.T., 10/28/25, at 192-93.

Because we affirm the termination decrees, the appeal from the goal-change orders is moot. ***See Int. of A.M.***, 256 A.3d 1263, 1272-73 (Pa.Super. 2021) (finding challenge to goal change moot in light of termination of parental rights). We therefore dismiss the appeal from the goal change orders.

Decrees affirmed. Appeal from orders changing goal to adoption dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/29/2026